IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION-CIVIL

In re:

THE PRODUCERS, INC.,

    Debtor.

_____/

VIVIAN SOLARES CAHILL, individually,
and MICHAEL GARDNER, as Personal
Representative for the Estate of Sandra F. Gardner,    No. 8:24-cv-905-WFJ

SIGMUND SOLARES and MICHAEL GARDNER      No. 8:24-cv-906-WFJ

THE PRODUCERS, INC.           No. 8:24-cv-907-WFJ

    Appellants,

v.


GREGORY FAIA, VERNON DECOSSAS, III,
DNC HOLDINGS, INC., DOM HOLDINGS, INC.,
and DOMAIN APPS, LLC

    Appellees.

_____/

## ORDER AFFIRMING BANKRUPTCY COURT'S FINAL JUDGMENT AS TO COUNT III

These three related appeals are identical, arising from an adversary

proceeding, *Faia et al. v. Solares, et. al.,* No. 8:21-ap-333-CPM.  There, the

Bankruptcy Judge entered Final Judgment as to Count III of the adversary

complaint and this appeal after trial arises on a Federal Rule of Civil Procedure 54(b) certification.  The underlying case is complex, but in summary the Court affirms because 1) the Bankruptcy Court had subject matter jurisdiction, as all parties urged below; 2) the Bankruptcy Court did not err as to choice of law; and 3) the appellants received a fair hearing including on their defenses.

*GENERAL BACKGROUND*

The Bankruptcy Court undertook a six-day trial and rendered the exhaustive and persuasive opinion resulting in this Final Judgment.  The final order and opinion appealed from in each case are attached hereto as an appendix for convenience of review.  *See* Appendix: Dkts. 17-2 (final order, titled Final Judgment as to Count III"), 17-3 (opinion, titled, "Order and Memorandum Opinion Following Nominee Trial").  The record citations are identical in each case and are cited here from the District Court 905 docket as "Dkt. ___."

As a preliminary comment, the Court notes that appellants do not contest the factual findings made below.  These findings include adverse credibility determinations for appellants and their witnesses.  The facts found by the Bankruptcy Judge at the trial, uncontested on appeal and with no clear error asserted (or apparent to the undersigned) are adopted here.  The facts are most unhelpful to the relief that appellants seek.  The Bankruptcy Judge likened the

activities and machinations of the parties, most pertinently and proximately to appellant principals,  as a spider's web of deceit.  Appendix Opinion at 1–2; Dkt. 17-3 at 1-2.    The record supports this.  In this underlying case the appellant principals engaged in sharp tactics below the level of fair dealing that our system expects of parties that litigate.  The two appellant principals were not square.[1]

The Court refers the reader to the lengthy factual detail set forth in the Appendix.  A very truncated summary follows:

The Debtor is an internet servicer and domain entity known as The Producers, Inc.  As part of this ongoing dispute the Debtor was placed into involuntary bankruptcy, Appendix Judgment at 2; Dkt. 17-2 at 2, which later resulted in a consent to bankruptcy by the Debtor.  This Chapter 7 proceeding eventually settled after a lengthy procedure, with a conversion to a confirmed Chapter 11 plan.  It is this settlement that the premeditated plan hatched by the appellants sought to undermine and upset.  The settlement involved DNC Holdings, Inc., Domain Apps, LLC, and DOM Holdings, Inc., along with appellees Decossas and Faia entering into a settlement with the Debtor's estate, the

---

[1] "**Square**: … **2.** Honestly and openly. **– out of square.**"  Houghton Mifflin Co., American Heritage Dictionary (New College ed., 1976).  The criticisms of appellant principals by the Bankruptcy Court and the undersigned are condign.  The criticisms do not extend to appellants' counsel.

Chapter 7 bankruptcy trustee, and appellants Solares and Gardner.  Appendix

Opinion at  2, 7; Dkt. 17-3 at 2, 7.

     The settlement resolved ownership of DNC, Domain Apps, and DOM.  As

part of the settlement, appellees and their entities paid over $4.6 million to

appellants Solares and Gardner.  Solares and Gardner expressly represented in

the settlement that Solares and Gardner had "complete authority to execute and

resolve the [parties'] rights as they propose to accomplish herein," which was

understood to be a "global resolution."  Appendix Opinion at 12, 49-50; Dkt. 17-3

at 12, 49-50.

     As a result of the settlement, the Bankruptcy Court subsequently granted

the Debtor's request to convert the bankruptcy case to a Chapter 11 proceeding.

Dkt. 19-392 at 7.  Shortly thereafter, the Debtor, under the management of

Solares and Gardner following that conversion, filed a Chapter 11 Plan of

Reorganization and Disclosure Statement.  Dkt. 17-211, 17-212. Section 5.01 of

the plan states that "the Settlement …. effectively will serve as the means for

implementation of this Plan."  Dkt. 17-211 at 16.

     The Confirmation Order of the underlying Chapter 11 bankruptcy reflected

that this settlement (and a separate agreement among appellants) was the

"lynchpin for the global resolution of all disputes between the parties…."

Appendix Opinion at 12; Dkt. 17-3 at 12.  The settlement was the key factor in the Court's decision to convert the original Chapter 7 to one confirmed under Chapter 11.  *Id.*; *see* Dkt. 17-221 at 4.  Appellants' very own confirmation plan stated the settlement (that appellants would soon seek to eviscerate) was in great part "the means of execution of the Plan."  Dkt. 17-221 at 4.

Based on the evidence presented at a confirmation hearing on May 13, 2021, including the proffer of testimony from appellant Solares, the Bankruptcy Court entered its Order Confirming Chapter 11 Plan.  The Order stated that the "Plan is feasible only because of the Equity Settlement and [Settlement]" and that the plan had been proposed in good faith.  Dkt.  17-221 at 1, 4-5.[2]

Solares and Gardner did not act in good faith.  Rather, they had arranged a ploy prior to the confirmation.  They called this tactic "Plan B."  The intent of Plan B was to retake assets Solares and Gardner had given up in the very settlement they had agreed to, and to put to naught the settlement/lynchpin of the confirmed plan, impairing all the effort and orders of the Bankruptcy Court and the other parties.  Appendix Opinion at 45-49; Dkt. 17-3 at 45-49.  These facts

---

[2] The Equity Settlement was an agreement between Solares and Michael Gardner regarding how they would own and manage the Debtor.

were found by the Bankruptcy Court, are not contested here, and are well based in this record.

Shortly after the confirmation, appellants engaged this "gotcha." Under this tactic, Vivian Cahill (Solares' sister) and Michael Gardner (on behalf of his deceased mother's estate) sent letters stating that the sister and mother's estate were exercising old options that were not mentioned in the settlement agreement. Neither the sister nor mother were parties to or part of the settlement in any way. And the options were not discussed at the global settlement. Solares' sister and Gardner via his mother then, under the options, demanded turnover of companies and assets retained by appellees as consideration under the settlement. Appendix Opinion at 8; Dkt. 17-3 at 8.

Signed options were never produced in any of this litigation and the Bankruptcy Court never made findings as to their being extant. But one or more witnesses testified options had been signed. No options are in this record. They were apparently created for an entirely different purpose years before, prior to this bitter feud between the parties.

By this hidden, delayed tactic Solares and Gardner sought to "blow up" the very settlement they had participated in and agreed to as a global resolution; the same settlement that the Bankruptcy Court had endorsed (at the urging of Solares

6

and Gardner) as integral to the Chapter 11 Plan.   The record is unclear whether this was buyers' remorse or just greed.

These men labeled this pre-planned tactic as "Plan B."  Proof of this premeditated Plan B to vastly alter or thwart the settlement and Chapter 11 Plan is well-established in this record and includes audio tapes of Solares and Gardner. Plan B was discussed on a tape recording between  Solares and Gardner prior to the hearing for confirmation of the Chapter 11 Plan,  and seems likely to have been discussed well earlier.  Appendix Opinion at 42-48; Dkt. 17-3 at 42-48.  This was craft unbecoming of the fair dealing that proper litigants should expect.

Once appellants surfaced the options and sought to negate the settlement Solares and Gardner had agreed to, appellees reopened the bankruptcy proceeding and commenced this adversary proceeding to enforce the Bankruptcy Court's order approving the settlement and reserving jurisdiction to enforce its terms.

As the trial on the merits of the adversary complaint neared, Solares' sister and Gardner's mother's estate filed a motion to bifurcate the trial, and to hold trial only on Count III.  *See* Dkt. 18-156.  This bifurcated proceeding would determine whether any option rights held by the sister and mother were bona

fide, or whether Solares and Gardner themselves remained the true holders of such rights.

The motion sought to bifurcate and try only Count III. In this count, the adversary complaint sought enforcement of the settlement via a permanent injunction enjoining appellants from seeking to enforce the purported option agreements to undermine the settlement. Dkt. 19-392 at 8–9. The gist of this Count III is that the appellants Solares and Gardner, not their sister and mother, were the beneficial, real parties in the options.

Solares' sister and Gardner for his mother's estate contended that the bifurcation would further judicial economy, and resolution of the nominee issue might resolve the adversary proceeding entirely. Dkt. 18-156 at 6 – 8. After holding a hearing on this motion, the Bankruptcy Court entered an agreed order for bifurcation of Count III for trial. Dkt. 18-168 at 2-3. The sister and mother's estate consented to the Bankruptcy Court's entry of an appealable determination on the nominee issues, "through appropriate final judgment." Dkt. 18-168 at 2-3.

After trial on Count III, the Bankruptcy Court found by clear and convincing evidence that the sister and mother were nominee holders of the options, and the beneficial, real owners were Solares and Gardner. Appendix Opinion at 3, 25, 51-55; Dkt. 17-3 at 3, 25, 51-55. Appellants' case was hampered by

contemporaneous records and recordings which supported this finding. *Id.* at 26-32. A fair reading of this entire record shows that the sister and mother were bare nominees or "cut-outs" of Solares and Gardner. The two nominees were arranged well in the past for a different purpose, never with a real, bona fide interest in the present dispute. And the principals Solares and Gardner had released their claims in the global settlement.

The Bankruptcy Court found that the sister and mother of Solares and Gardner were mere nominees. The Court permanently enjoined any attempt to contravene the settlement and its orders by use of the options. The injunction pursuant to this judgment was issued pursuant to Section 105 of the Bankruptcy Code, 11 U.S.C. § 105(a), and the All Writs Act. Appendix Judgment at 3-4; Dkt. 17-2 at 3-4; *see also id.* at 5 (discussing traditional equitable principles involved).

The Bankruptcy Court generally credited the testimony of appellees, but found the testimony of appellant witnesses to be unworthy of credit. Appendix Opinion at 32–51; Dkt. 17-3 at 32-51. As noted, these fact findings are not contested on appeal. The undersigned's review of this trial record also concurs with these findings as to credibility or lack thereof.

*LEGAL ISSUES AND ANALYSIS[3]*

### *Choice of Law*

Appellants raise the issue whether the nature of the options should be addressed under Florida or Louisiana law.  The Bankruptcy Court found that the same result would obtain under either State's set of legal principles.  Appendix Opinion at 14–16; Dkt. 17-3 at 14-16.  This Court agrees, after reviewing the law cited on each side of this issue, and after hearing oral argument on the point.

These options, as a matter of historical fact, were not bona fide held by the nominees.  The nominees' ownership as a matter of fact was tissue, not real.  The proof in support of the nominees' facts  failed because it was not credible and was contradicted by credible evidence.  As found by the Court below, and based upon all credible facts set forth, the beneficial, real holders of the options were Gardner and Solares, not their sister and mother respectively.  This simple, historical fact (which is not contested here factually and is plentiful in this record) is not impacted by Florida versus Louisiana substantive law.  Dkt. 19-392 at 15–16.

---

[3] This Court reviews the facts found below for clear error, and legal conclusions *de novo*.  *In re Club Assocs.,* 951 F. 2d 1228–29 (11th Cir. 1992).  Although there are no errors asserted here regarding the facts found, the undersigned has reviewed those findings, and there is no error, let alone clear error.

The uniqueness of Louisiana law does not require a court to close its eyes to the plain, admitted and uncontested facts on the totality of the record. *See generally*, *Succession of Delaune,* 138 So. 2d 41, 50 (La. Ct. App. 1962); La. Civil Code art. 1849; *Kennedy v. Bearden*, 471 So. 2d 871, 874 (La. Ct. App. 1985); *Lane v. Lane,* 375 So. 2d 660, 676 (La. Ct. App. 1978); *Succession of Terral*, 312 So. 2d 296, 300 (La. 1975). This is especially true when much of this evidence as to bona fides was not subject to contemporaneous objection. Plan B failed because it was base trickery, as illuminated at trial, and this would have been clear under either Florida or Louisiana law. The choice of law issue is not much more than a red herring.

### *Subject Matter Jurisdiction*

Appellants below asked for a bifurcated trial before the Bankruptcy Judge, arguing that such a trial "promotes judicial efficiency because if a court with subject matter jurisdiction determines with finality that [Solares' sister and Gardner's mother] were not the nominees of Solares and Gardner in 2011 and 2012, no further trial involving [them] would be necessary because the Settlement Agreement unambiguously does not govern them or the Options." Dkt. 18-156 at 8. Appellants' motion for the trial yielded a hearing on the motion to bifurcate.

The Bankruptcy Court held a hearing.  Dkt. 18-170.  The consented

bifurcation order was the result.  Appellants' counsel at this hearing  clearly

consented to, even sought out, subject matter jurisdiction as to Count III.  It is

clear that subject matter jurisdiction cannot be obtained by consent, but the

entire trial to final judgment on Count III was advocated for, and agreed to, by

Appellants.  It is incongruous now to receive an argument that there was no

jurisdiction as to Count III.

Appellants' counsel opened the bifurcation hearing by stressing the need

for a binding judgment on Count III, not one that could later be deemed an

advisory opinion or nullity.  And he noted the Bankruptcy Court could enter a

final, not advisory order.  Dkt. 18-170 at 10–14.  Appellants' counsel stated, "the

Court, under this bifurcated trial, would have the proper power to enter a final

judgment, subject to appeal, on that determination [as to nominee status]."  *Id.* at

16.  Counsel stated that if his clients were nominees for parties who were before

the Court, and which parties entered into a settlement that the Bankruptcy Court

approved, "that does bring that issue before the Court."  *Id*. at 18.  In other

words, Appellants' lawyer plainly stated to the Bankruptcy Court that it had

subject matter jurisdiction as to his clients on the Count III nominee issue for final

judgment:

> [b]ecause if they were nominees for parties who were before the
> Court, and who did enter into an agreement that the Court
> approved, then I believe that that does bring that issue before the
> Court, which takes us back to the whole reason why I started
> advocating for the bifurcation. Because that issue is the one issue
> that I thought could and should be resolved, and should be dealt
> with, and did not share the concerns that the Court perhaps lacked
> the subject matter jurisdiction….

*Id.* at 18.  Counsel stated that subject matter jurisdiction did exist.  Counsel

agreed that the sister and mother were "indispensable parties" to Count III if they

were nominees.  *Id*. at 19–20.  He stated that appellants were bound by the

settlement agreement if they were mere nominees.  *Id.* at 34–35.  And "if the

Court determines that nothing was granted…that would be something that this

Court can enter a final judgment on with respect to that issue."  *Id.* at 36.

   This Court agrees.  As to Count III, the undersigned affirms the Bankruptcy

Court's legal determination that it had "related to" subject matter jurisdiction in

this case.  28 U.S.C. § 1334(b).  Appellants acknowledged below that the

Bankruptcy Court had retained jurisdiction to interpret the settlement agreement.

Dkt. 18-170 at 19.  The settlement agreement and its progeny,  the Chapter 11

confirmed plan, would be disrupted, utterly upended if appellants' "Plan B"

gambit (springing the options post settlement) had succeeded.

Count III is closely intertwined with prior orders of the Bankruptcy Court, including the confirmation order, and would impact the execution and administration of the Chapter 11 Plan. *See Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009); *In re Kachkar*, 769 F. App'x 673, 678–79 (11th Cir. 2019). That is sufficient to establish related to jurisdiction. A bankruptcy court may still exercise related to jurisdiction after the confirmation of a Chapter 11 plan. *In re Kachkar*, 769 F. App'x at 679. The exercise of jurisdiction in such a scenario is appropriate where the claims at issue have a "close nexus to the bankruptcy plan or proceeding sufficient to uphold bankruptcy court jurisdiction over the matter." *Id*. (citation and internal quotation marks omitted). Generally, "[m]atters that affect the interpretation, consummation, execution or administration of the confirmed plan will typically have the requisite close nexus." *Id.* That test is met here.

Here, the determination of the "nominee issue" and enforcement of the settlement order, settlement, and confirmation order, are not only intertwined with various orders of the Bankruptcy Court but directly implicate the implementation, execution and administration of the Plan. The Bankruptcy Court's confirmation order explicitly states that the feasibility of the Plan hinges

on the settlement.  And the Debtor's plan states that the assets transferred by

Appellees pursuant to the settlement are the means of implementing the Plan.

Further, the Supreme Court has further explained that a Bankruptcy Court

"plainly [has] jurisdiction to interpret and enforce its own prior orders." *Travelers*,

557 U.S. at 151.  Appellants' position is that the Bankruptcy Court cannot enforce

a key prior Order, even if subject to machinations like Solares and Gardner pulled.

Consistent with the Supreme Court's statement in *Travelers*, the Eleventh Circuit

has held that such subject matter jurisdiction exists as an independent basis,

beyond the "close nexus" related-to analysis.  *In re Kachkar*, 769 F. App'x at 680.

Count III required the Bankruptcy Court to interpret and enforce provisions

of the Confirmation Order and Settlement Order.  This included injunction

language in each order that directed the parties' performance and compliance

consistent with those orders, when it determined Solares' sister and the Gardner

Estate were nominees and therefore subject to the Bankruptcy Court's prior

orders.  Similar to *Travelers* and *Kachkar*, the Bankruptcy Court had subject

matter jurisdiction to interpret and enforce the Settlement Order and

Confirmation Order.

Finally, a bankruptcy court always retains jurisdiction over matters

considered "core" or that arise under the Bankruptcy Code. *In re Seven Fields Dev.*

15

*Corp.*, 505 F.3d 237, 260 (3rd Cir. 2007). Confirmation of a plan is a "core proceeding" in bankruptcy. 28 U.S.C. § 157(b)(2)(L). As noted above, the Supreme Court explained in *Travelers, supra,* 557 U.S. at 151, when a court has "arising under" or "arising in" jurisdiction to enter an order, it retains jurisdiction to enforce that order. Similarly, the Eleventh Circuit has held that "[c]ivil contempt proceedings arising out of core matters are themselves core matters." *In re Ocean Warrior, Inc.*, 835 F.3d 1310, 1318 (11th Cir. 2016) (internal citation and quotation omitted); *see also In re Chesapeake Energy Corp.,* 70 F.4th 273, 281 (5th Cir. 2023)("Within its core jurisdiction, the court may also be called upon to interpret the terms of a confirmed reorganization plan."); *In re Essar Steel Minnesota, LLC*, 47 F.4th 193, 199–200 (3rd Cir. 2022) (enforcement of a plan's discharge injunction implicated a core matter); *In re Allegheny Health Educ. & Rsch. Found.*, 383 F.3d 169, 174–76 (3rd Cir. 2004) ("[T]he bankruptcy court correctly determined that the suit was a core proceeding because it required the court to interpret and give effect to its previous sale orders.").

Here, Count III required not only the enforcement of the settlement and a determination of its scope, but also the determination of core matters, and the enforcement of related rulings, underpinning the Settlement Order, Confirmation Order, and Chapter 11 plan provisions. If Plan B had accomplished its

16

surreptitious goal, the entire administration of the closed case and confirmed

plan of bankruptcy would have been impaired.  Accordingly, the Bankruptcy Court

had subject matter jurisdiction over these "core" issues that were implicated

when it enjoined Appellants' post-hoc tactic to undermine the prior resolutions of

these "core" matters.  Appellants' conduct, which is not contested on appeal,

directly implicates the integrity of the bankruptcy process and subject matter

jurisdiction exists for this reason, as well.

### *The Relief Awarded Was Appropriate*

All parties understood and agreed to the Bankruptcy Court's entry of a final

judgment on the entirety of Count III.  The bifurcation order, Dkt. 18-168,

expressly provided for the issuance of a final judgment and the parties were clear

in seeking bifurcation that they sought a final order that would be appealable.

The Judgment is simple:  The sister and mother were mere nominees and the

parties and their agents are enjoined from using the options "in violation of the

court-approved [settlement] Agreement."  Appendix Order at 3; Dkt. 17-2 at 3.

Given the uncontested facts, this is a no-brainer.

It is a matter of fact that the options held by Solares' sister and Gardner's

mother were not bona fide interests of the sister and mother.  And Solares and

Gardner tried to employ the options unethically in this manner to avoid their prior settlement and undermine an extensive confirmed plan in bankruptcy.

The appellants Solares' sister and Gardner's mother contend in a short passage of their brief, Dkt. 27, that the Bankruptcy Court did not consider their defenses to injunctive relief, and those equities asserted in their defenses when issuing judgment.  But the argument does not list any proof or evidence that these appellants sought unsuccessfully  to offer in this regard.  Whatever they sought to put forward as a defense was their burden, and no evidence is cited as limited or precluded.  The undersigned is not aware of an offer of proof concerning any precluded evidence.

This was a lengthy trial in which the Bankruptcy Court considered a wide range of evidence, including from Solares and his sister.  The Bankruptcy Court found neither credible.  These factual impressions from below are not appealed here; but the undersigned, having read the transcripts, agrees.

 In its Order, the Bankruptcy Court necessarily considered and rejected all affirmative defenses.  Appellants had the opportunity to, and did, present evidence to support their affirmative defenses.  The lengthy opinion shows the Bankruptcy Court was unpersuaded that any defense would be worthy.

Following entry of the Judgment, Appellants then had another opportunity to argue these points related to equitable defenses.  Dkts. 19-395, 397, 399.  Their points were received, and rejected at the Bankruptcy Court's hearing on their motion.  Dkt. 19-419 (transcript); Dkt. 19-422 (Order).  The Bankruptcy Court did not abuse its discretion in denying the post-judgment motions.

The Bankruptcy Court engaged in weighing equities pursuant to Section 105(a) of the Bankruptcy Code, *see, inter alia,* Appendix Order at 5; Dkt. 17-2 at 5.  Consideration of the equities is not required when issuing an injunction under the All Writs Act.  *In re Fundamental Long Term Care, Inc.*, 873 F.3d 1325, 1338 (11th Cir. 2017).  By definition, an All Writs Act injunction may issue when necessary to protect a court's jurisdiction and effectuate its orders.  The appellants sought to undermine those orders by Plan B.

### Rule 54(b) Certification

The Bankruptcy Judge certified the Final Judgment under review here, Count III of the Adversary Complaint, for appellate review pursuant to Federal Rule of Civil Procedure 54(b).  There are other counts yet pending in the adversary proceeding, but the Judge found that there was no just reason to delay finality concerning Count III.  The Bankruptcy Court found that the parties should not bear the expense of litigating the other counts until this, likely dispositive count, is

19

resolved.  Appellants are in agreement with this holding and urged it, Dkt. 18-156 at 8, and so does this Court.  Resolving this count now will serve judicial and litigation economy.  Failure to review this count now would impair Rule 1's admonition to construe the rules "to secure the just, speedy, and inexpensive determination of every action and proceeding."

The Rule 54(b) inquiry involves two steps in certifying a matter.  First, the court must determine that its final judgment is, in fact, both "final" and a "judgment."  This means that it must be an ultimate disposition of an individual claim and a decision that is upon a cognizable claim for relief.  *Lloyd Noland Found. v. Tenet Health Care Corp.*, 483 F.3d 773, 777 (11th Cir. 2007) (collecting cases).  Having found that the decision is a final judgment, the court must then determine that there is no just reason for delay in certifying it as final and immediately appealable.  *Id.*  In this last inquiry the court must exercise discretion in certifying partial judgments by considering judicial administrative interests, avoiding piecemeal litigation and appeals, and assessing the equities involved.  *Id.* at 778.  These interests favor both the Bankruptcy Court and the District Court's (here, if need be) certification under Rule 54(b).  Resolution of Count III will almost certainly resolve entirely this present bankruptcy-ancillary dispute and remove the doubt currently cast on the confirmed Chapter 11 Plan.  It will also

20

ensure continuation of the Chapter 11 Plan without further hindrance or impediment.  And it will further the interests of final, equitable, and enforceable settlements of bankruptcy disputes.  Rule 54(b) certification helps "stop the bleeding and end the heated litigation between these four men that has been ongoing for [eight] years now."  Appendix Judgment at 5; Dkt. 17-2 at 5.  The parties and the Court below believe this certification is appropriate in this matter. So does the undersigned.

The undersigned certifies this matter under Rule 54(b).  There is no just reason for delay and final judgment here will issue.

Based on the foregoing, and review of the entire record, the Bankruptcy Court's order is **AFFIRMED**.  The Clerk is directed to enter judgment for the Appellees, to close the case, and to transmit a copy of this order to the Clerk of the United States Bankruptcy Court for the Middle District of Florida.

**DONE AND ORDERED** at Tampa, Florida, on May 19, 2025.

_____

WILLIAM F. JUNG
UNITED STATES DISTRICT JUDGE